136056, 136156, United States of America v. Courtney, Jr. Noble, Indiana Lynn Brooks, arguments not to exceed 10 minutes for appellants, 20 minutes for appellee, Mr. Anderson, Mr. Gore for appellants. Mr. Anderson, are you the first to argue? It doesn't matter to us, whoever you've decided to come first should start. And you are Mr. Gore? I am Mr. Gore. Please proceed. May it please the court. I represent Dena Brooks in this case. This is a situation where there is a traffic stop made along the interstate. The facts pretty simply were that there is an investigation going on and the authorities had been conducting surveillance and they had been unsuccessful on finding what they were looking for. They took another route and they checked the parking lot of a hotel. They saw a vehicle leave that parking lot. The detectives that were actually involved with the case then contacted somebody else and they arranged a traffic stop. In the traffic stop, the officer that made the stop was a patrolman. He was clearly told, use your own probable cause to make the stop. So that's what he did. Was your client in the car? No. So do you have any basis for saying you have standing to object to what was found in the search of the passenger? That's never been raised until you just raised it. And I'm afraid my belief is that the answer is no, you don't have standing. The fact that it hasn't been raised, and of course I'm eager to be informed if I'm wrong about that, but is this the kind of standing that we should notice at this point in time? It seems like my standing is they made this stop and then based on that they went to where my client was, so it kind of all flows through. So as a result of these actions, I get drug into it. And this was a conspiracy charge, so the best I can say on that it was a conspiracy, and I was wrapped up in that conspiracy, and this search resulted in a subsequent search of where my client was. So the cases that I would be concerned about are the Padilla case, it's a Supreme Court case, and Wong Son, which is a classic case. So you can go on with your argument, but that's where my concern is. I understand. In this situation, the trooper determined that the tint on the window was too dark and that the driver weaved into a lane, so the stop was initiated. Mr. Burr, which arguments are you going to make as compared to Mr. Anderson? I was going to argue the – I raised three in my brief. The third one was on probable cause. The government didn't address that, and they're not concerned with that, so I'm not going to address that at all. Frankly, it's probably irrelevant. I was going to address whether the stop, the initial detention, exceeded the scope that it should have, and then whether they had the right to get Mr. Noble out of the vehicle and perform a tariff risk on him. All right. And those two arguments are common in our two briefs, actually all three briefs. So in this situation, they went up to the driver's side, and they talked to him, and he said, well, I was messing with my phone, that's why I swerved. The officer went back to his car, got his tint meter, came back, checked the tint. The tint was too dark. Then the driver said, well, it's not my vehicle. I didn't know about that. And then they asked the driver to get out. He complied. The officer wanted to see if there was any other explanation for the weaving, such as intoxication, so they asked him some questions. He didn't have any slurred speech. He didn't have any beer cans in the car. There wasn't any odor of alcohol. He didn't have glassy eyes. But while he's outside, the officer said, can we search you? Can we search the vehicle? And Mr. Atkins consented. He's allowed to ask that question, right, the officer? Yeah. I'm just trying to clear up what the arguments are. So you're not arguing that was any violation, correct? No. I think he can ask the question. These types of cases, I think, turn on the scope and the length of the detention. Was this detention any longer than necessary to produce a ticket for driving with unduly tinted windows? Well, I think the stop was completed before they ever asked Noble to get out of the vehicle. So I think there's a legitimate question where they could even ask Noble. Well, but they were going to give a ticket for the overly tinted windows. And as they're – correct me when I'm wrong – as they're preparing to do that, they say to driver Atkins, can we search your car? And Atkins says, sure. I think they can ask, but – And he says yes. So he could have said no, in which case then they couldn't prolong it any further than giving the ticket for the tinted windows. But Atkins says yes. And doesn't that then allow for a lot of time, in which case we get to the question about Noble? Right. Well, I mean, do you agree with that? I think – You don't have to agree. Okay. No, I agree. You don't have to agree. Right. I mean, I think the question can get asked. I mean, I think there are several cases out of this circuit that allow them to ask basically extraneous questions. I think the problem becomes if it drags on, then you've got to be turning up some reasonable suspicion of criminal activity to maintain that detention. And in this situation, he had cooperated fully. And it would just be my position on that initial phase of this argument that the stop was completed at that point. They had all the information. They're not going to learn anything. I'm just trying to be clear on what your objection is specifically. I mean, what is it specifically that the officer did that you think is violative of the Fourth Amendment? He's not asking the question, so what is it? I don't think they had the right to get the passenger out of the vehicle. Okay. Because there hasn't been anything that had been discovered. But wait, if they're going to search the vehicle, can't they have the occupants step outside the vehicle? They can. So if the getting out's not the problem, what specifically is? I'm just saying that it seems like this dragged on longer than it should have under these circumstances because they'd already completed everything they needed to know. But for somebody saying, yeah, go ahead and search the vehicle. The cases like your decision, Aguilera-Pena, the officer asked those questions within two minutes of the stop. He asked for consent to search, and you all said that was okay, and that was within two minutes. The Burton case was another case that the officer started asking questions. But in both those cases, or in the Burton case, something triggered the officer. He thought the person was being deceptive, so he continued with his questioning. There is nothing like that in this situation. So I would just say that I think the length at the time of the detention was inappropriate. How long was the detention? I don't know for sure. The length of time it took him to go back and forth to his vehicle to ask him these questions, to get him out of the vehicle, to talk to him outside the vehicle. It's not the case where you wait on a drug dog for 20 minutes or something like that, and I understand that. The stronger argument, I think, is the argument that relates to the pat-down of Mr. Noble. And if I might, I apologize. Where did I look for my time? Is the time showing on the clock there? If you want to give your time to your co-counsel to develop that issue, that's certainly fine. All right. Well, I'll do this very quickly because this is, frankly, a much stronger argument on this risk. They said that the passenger is nervous and that they were investigating a drug case so that basically the district judge ruled that because of the nervousness and the suspicion of criminal activity, that was sufficient for a frisk. But the problem, the district judge, that created reasonable suspicion to believe that Mr. Noble was armed and dangerous. He was nervous. There are a number of cases that say nervousness doesn't establish reasonable suspicion of being armed and dangerous. And in this situation, the driver pulled over and cooperated. There's no attempt to conceal anything. There was no reaching to hide objects. It was early evening on the interstate. There were two police officers there. Atkins cooperated. He consented. The officer didn't know the names of these people. He didn't know who was going to be in the vehicle. He didn't know any criminal history on these people. He didn't know if there was any propensity for guns. Is it relevant that the officer was told that the car was involved in drug trafficking? It is relevant. But if you allow him to frisk somebody based solely on thinking that there's drug activity, that basically creates a bright line rule, where if any time the police stop somebody on a suspicious of drug activity, they can pat them down. You've got to think they're armed and dangerous. The question, I suppose, would be, you have the nervousness combined with the knowledge that the car is involved in drug activity. Are those two combined enough, or do you still need to have some basis either for fearing that Noble might be armed or knowing that Noble, having reasonable suspicion that Noble is involved in the drug business? I think just because somebody's involved in the drug business doesn't automatically make them subject to a reasonable suspicion that they're armed and dangerous. Because if you go with that, I mean, it does. It creates a bright line rule where every drug suspect can be patted down. And I don't think that's the situation. How about burglary suspects? They have burglary tools on them. So if somebody's involved with a burglary ring, can you frisk them automatically if they're nervous? Any kind of criminal case. And that basically would allow the police to pat down anybody that they suspect of criminal activity. What if the burglary suspect was at a pickup truck that was at the scene of a burglary? It depends how much they know. I mean, if there's stolen stuff in the back of the pickup truck, I mean, you might have grounds to arrest somebody based on probable cause. Don't we have here a car that's involved in drug trafficking from the report from the officer in charge? It's not. It was suspected of being involved. Was that suspecting reasonable? But just does that suspicion automatically translate into being able to say, I'm going to search this guy because he could be... No, he didn't search the guy. He patted him down. But what's the answer to Judge Tarno's question? He asked whether the suspicion was reasonable. I don't think there's enough there. That's what I'm saying because if you don't require something more than just being nervous, because they knew nothing about this guy. If you don't require something more... There is more. I mean, there's a report that the vehicle is suspected to be involved in drug activity. But they didn't even know this guy was in the vehicle. This guy wasn't even one of them. Well, it's not the vehicle itself that's doing the drug activity. It's the occupants. I mean, it's another way of saying it. And your red light is on, so thank you very much. Thank you. May it please the Court, Mr. Wisdom and Ms. Claster. Did I get it right? Yes, sir. Good. I represent Courtney Noble. Of course, you've heard that the vehicle was stopped due to a traffic violation of not having properly tinted windows, over-tinted windows. Mr. Noble was a passenger. As the investigation revealed that the officers conducted, Mr. Noble had not been previously identified as a person suspected of drug activity. In fact, the vehicle, I don't think that particular vehicle was one that was under surveillance, either the Tahoe. I think the vehicle under surveillance was a Cherokee or a Jeep, some type of other vehicle. But didn't the confidential informant say that the Tahoe was involved in the drug trafficking? When the confidential informant had predicted that it was going to be the Jeep, that I guess it was Brooks was going to be driving, went through, it didn't go through, so then the confidential informant says, oh, it could be a Tahoe. Well, he said, as I remember, that they meet there at the La Quinta. I think that's where they met, supposedly. He's talking about things in the past, not that particular day, but things in the past. And he said that look for a Tahoe because Adkins drives a Tahoe. But if there was something to be transported between Louisville and Lexington, it would have, in the past, they're talking about their investigation, what the investigation revealed, it would have been in the white car, I believe, a Jeep. But the Tahoe was a vehicle that Mr. Adkins owned, apparently. In any event, Mr. Noble was a passenger, and there had been no prior mention, identification, speaking of him by police authority at all. When we're... When they did the frisk of Noble, did they know Noble's identity, the police? They didn't know it unless they asked him. Well, do we know from the record whether they knew his identity? They did not know his identity, no. And the Terry conditions on a traffic stop, we have the Terry conditions as to frisk, and there must be a reasonable articulable suspicion. With respect to... It's a suspicion of what, a suspicion that he's armed? Armed, that's it. That's it. You're right with respect to a Terry frisk. It has to be that he's armed. The... Mr. Adkins was, you know, he was not giving bad answers. He was cooperative, in fact, giving permission to search. There wasn't anything alerting through the driver that would alert that there was some problem. The only thing that alerted, that the officer said, Officer Ray claimed, that he was, that Noble was extremely nervous and that that was the reason for doing a Terry frisk. But between the time that he stops the car, Ray takes Adkins to the rear of the car and speaks to see whether he's been drinking or not, determined that he had not, so he's not going to charge him with DUI. So then during that time, another officer arrives, Hart. Hart is the fellow, the detective that had contacted the traffic officer to make the stop. And Hart walks by the car and sees Noble sitting there. He does not know who he is. And says, Put your hands on the dash. So he put his hands on the dash. Next thing Noble knows is, or what the case is that affect Noble, is that after getting the consent to search the vehicle from Adkins, Mr. Ray, the officer Ray, comes to the door, passenger door, and asks him to step out. Can I interrupt you just for a moment, sir? So it's Agent Hart, right, who does the frisk? No, it's Ray. Okay, so it's the officer who pulled over the vehicle who does it. Yes. Okay, thanks for the clarification. So the frisk of your client occurs after he's been asked to get out of the car. And according to the officers, he's shown extreme nervousness. And he's in a car, he's a passenger in a car that they have been told is involved in drug trafficking. But they don't know anything about your passenger client. And so, I mean, your argument, I guess, is that, I mean, the officers would do this search because they'd be fearful that someone would pull a gun. That's right. I mean, that's the basis that, you know, we would allow this sort of thing. And so it's your argument that under these circumstances, extremely nervous passenger vehicle, suspected of being involved in drug activity, that, and I think sort of, you know, almost common knowledge that people involved in drug activity often carry firearms, that the officers have to just sort of run that risk while the search is ongoing? Well, no. But they had walked by Mr. Noble. And Mr. Noble had sat there in the car, no problems. In fact, he just acquiesced in everything that occurred. He made no protests. He made no resistance. He didn't do anything. But what should the officers have done if they've already gotten Adkins' consent to search the car? So they're going to search the car. What should they have done differently? Should they have just let Noble stand around and watch? Well, I can tell you what the practice is usually in Kentucky, and that is the officers will place the passenger in the cruiser, not under arrest. But they say it, you ask them, is he under arrest? No. Without patting him down. Without patting him down. Because I know I was on a case in the last few years where the person who was put in the back of the police car actually killed himself with a gun, and the police were sued for that. So there's sort of an interesting conundrum that they might have. But, well, he killed himself too, not someone else. And we've got to have the articulable suspicion. The fact that Ray claimed that the reason was nervousness and the remote location. This was hardly a remote location. This was near the intersection of I-74 and I-75. And just about probably less than a half a mile from that intersection. A lot of traffic. So it's hardly remote. And I don't think that makes any difference anyway. That doesn't satisfy reasonable articulable suspicion. Ray told Noble, I'm patting you down for weapons. Ray did not detect a weapon. He testified he felt what he thought was crack cocaine. He did not describe the substance. And that was in the right pocket, Mr. Noble's right pocket. He did not describe the substance as to contour or mass. He testified he heard crumpling, and it had the feel and texture of crack cocaine. When asked by the U.S. attorney what made it immediately apparent, it was contraband, Ray said, It is hard to explain, but almost like thick sand, I would say that's a good description of it. So the substance as contraband was not immediate apparent. But this part we review under plain error. Right. Yes. So the question is whether it would be obvious that it wasn't obvious, I suppose. I mean, if it would have been sort of immediately apparent to the officer that this is probably drugs, then he's allowed to pull it out, I guess, and look at what's in the package. A plain feel is a corollary of plain view. And the exception to the warrant requirement. Well, the officer feels, as I understood it, a baggy with a crumply feeling and is describing this as sand. But does the officer ask your client what's in the baggy before the officer pulls it out? He says no. He does ask him something about... I thought the officer said to your client, What's in your pocket in this baggy? And your client says, I don't know. I don't know if he said baggy. I think he said, What is in your pocket? And he said, I don't know. I don't think he identified what... So isn't that in itself sort of suspicious that somebody doesn't know what's in his pocket? Well, that might be an answer given by someone who doesn't want to answer. Right? And I see your red light is on now as well. Okay. Well, it took me a lot longer. Sorry about that. It's our questions, I'm afraid. Yeah, I didn't get to my most important argument. But I think I've described it. Thank you. Thank you. May it please the Court. My name is Katie Kreitzer, and I represent the appellee, the United States of America, on appeal. This appeal is about fact-specific reasonableness, the touchstone of the Fourth Amendment, given the totality of the circumstances and the reasonable decisions that Officer Ray took in the totality of the circumstances at issue here. There are three issues currently before the Court. First, Officer Ray did not unreasonably prolong the stop at question by asking two additional questions and requesting consent to search. Second, Officer Ray had reasonable suspicion that Mr. Noble, an extremely nervous passenger in a car that was suspected of involvement in drug trafficking, was armed and dangerous. Do you know anyone who's stopped by the police who's not nervous, present company included? Your Honor, I think it is a reasonable reaction for someone to be slightly nervous when the police pull them over, but respectfully, that's not the only factor that was present here. Do you have a nervous detector to tell us whether it's 1 to 10? No, but what we do have in the record is that when Officer Ray spoke to Mr. Noble, he observed that he was extremely nervous, and based on his experience and Officer Ray's training, Mr. Noble was more nervous than a passenger. He didn't go to medical school, did he? He had about five and a half years of training as a beat cop, as an officer who dealt with these individuals all the time. We also know from the record that on the beat that he was working at the time, about once a week he observed individuals who were trafficking in drugs, and so he would have been familiar and had experience with these sort of individuals. In addition to the nervousness that Officer Ray observed, he knew from the officers on the task force that had been dealing with this case previous to his involvement, that the officers were investigating a group of individuals for drug trafficking. He also knew that this particular dark Tahoe was suspected to be involved in that group's trafficking of drugs. At that point, when he observed Mr. Noble and saw the nervousness, the fact that this car and the individuals presumably inside that car were involved in drug trafficking, he had a reasonable suspicion that Mr. Noble was armed and dangerous, and that reasonable suspicion proved to be true here. I guess I'm sort of concerned about the linkages that you're drawing on this. So there's nervousness, which is described as extreme and is based on officer experience, which presumably every officer has. And there's the knowledge that the Tahoe was involved in drug trafficking, but there's no knowledge at all specific to the passenger. So the passenger could be the babysitter for the kids. Your Honor, respectfully, the task force did have some knowledge of Mr. Noble before he came to be involved in this search. But did they know that Noble was the one that was being frisked? No, they did not know. They didn't know Noble's I.D. when Noble was being frisked, right? That's correct, Your Honor. At the time, Officer Ray did not know who the individual was that was the passenger in that car. So if you're the babysitter, which is a perfectly possible thing, you can be searched because you're nervous about being stopped by the police and you're in a car that drug traffickers are using. That's essentially the facts here. Your Honor, I don't think it's just that you're nervous. It was an extreme nervousness that Officer Ray observed based on his experience. It wasn't the typical sort of nervousness that he saw from a passenger in a car. And as I recall, he describes it as the shaking hand so that like a paper was shaking in his hands or something. Right. And Officer Ray, in his experience, and this is in the record, testified that he thought that this passenger was more nervous than the average passenger would be in a car stop. But did he give any concrete examples of how the nervousness was showing? One of the ways in which it manifested is that you saw in the record that Mr. Noble's hand was shaking while he was holding a can of soda. And even once Mr. Noble had placed that can of soda into his lap, he continued shaking in a way that suggested extreme nervousness to Officer Ray. Or Parkinson's disease or any other neurological problem. That's why it's important here to look at the totality of the circumstances. It's not just the extreme nervousness or even nervousness that an average passenger might have. It's the additional fact that Officer Ray knew that this car was under investigation for drug trafficking and he knew that the DEA task force had been investigating a group of individuals for drug trafficking. Here we had two individuals in a car that was suspected of drug trafficking and one of the individuals was extremely nervous. Correct me if I'm wrong, but my understanding of the group knowledge was that Adkins and Brooks were known to be involved in the Tahoe-slash-Jeep transfer of drugs, but that Noble's involvement was not specifically known in that locale. Am I right or wrong on that? Your Honor's correct that the confidential informant only identified Mr. Adkins and Ms. Brooks as individuals who were involved in the particular traffic that was going on that day. And the officers had already identified Adkins by virtue of getting his driver's license, I assume, when he was the driver who was stopped. They knew that Noble was not Brooks because Brooks is a woman and Noble is a man. Yes, Your Honor, but there is one piece of information that Officer Hart and some of the officers that were involved in this task force knew. They knew that Mr. Noble was a known purchaser of narcotics. But they didn't know Noble was the one being searched. That's correct. Officer Ray did not know that Mr. Noble was the passenger in that vehicle. What he did know is that the passenger in that car was extremely nervous, more nervous than he would expect a passenger in a car to be, and that that car and a group of individuals were involved in drug trafficking that was being investigated by a DEA task force. And so the basis for the search is reasonable suspicion that Noble might be armed, and it's for officer safety that the pat-down is being undertaken so that the officers can then search the car pursuant to the consent that was given. That's correct, Your Honor. So your opponent suggested that maybe Noble should be put in the back of a police car while the search occurs and then everybody would be fine. That is one option that the officers could have used, but it's not the only option that the officers were required to use. Officer Ray had reasonable suspicion that this individual was armed and dangerous, and that gave him the option to conduct a limited frisk for weapons, which is what he did here. Couldn't, because there were two officers, couldn't one of them have watched the two people, Adkins and Noble, while the other one did the search, and that would not involve any infringement of privacy interests of anybody? Again, Your Honor, that is one option that the officers had, but at that point you would have had two individuals that were suspected in drug trafficking alone with one officer, and there's always an officer safety concern when you have individuals that are involved in drug trafficking, and Officer Ray also testified that in his experience individuals that are involved in drug trafficking more often than not carry a weapon for their own protection. So at that point, given the facts that he saw there, Isn't that circular? I mean, he decides that he's involved in drug trafficking before he had any evidence that he was involved in drug trafficking other than, what was the expression you used seven times, extreme nervousness? Extreme nervousness, Your Honor. What he did know is he did know that that car was involved in drug trafficking and that there were a group of individuals that were being investigated for drug trafficking. It wasn't that just one individual was being investigated. Did they find anything in the car? They did not find anything in the car itself. The only narcotics that they found were the narcotics that were found on Mr. Noble. Suppose there was another passenger in the car who was not nervous. Could that passenger have been searched as well? Your Honor, again, we'd have to go back to the totality of the circumstances. Right, so that's the totality of the circumstances. And if that's the totality of the circumstances, there might not have been reasonable suspicion to search that individual passenger in the car. I don't think that the drug investigation by itself would have been enough, but the drug investigation in condition with the extreme nervousness, the extreme abnormal nervousness, was enough to provide reasonable suspicion to search Mr. Noble here. Could you address the issue that I raised in the beginning about whether the others other than Noble can object to the search of Noble? Your Honor, as you saw in our briefs, we have not briefed the issue of standing. It's my understanding that standing could not be waived. So if Mrs. Brooks lacked standing here, she would not properly be before the court. If Your Honor is interested, we could provide additional briefing on the standing issue and the Padilla and the Wong-Sun case that Your Honor cited, but we have not briefed that issue in our briefs. To go back to the reasonable extension of the stop here, as Your Honor has pointed out, there's nothing in particular about this stop, either the length or the scope of the stop, that went beyond what's permissible. Something that appellants spoke to you about in their oral argument is that they didn't know the exact length of the stop, but there is, in fact, evidence in the record regarding the length of the stop. We know that the stop had gone on for approximately two minutes before Officer Hart joined the stop, and then we know approximately three minutes after that, Officer Ray obtained consent from Mr. Adkins to search the car. So we know the total of the search and discussion here with Mr. Adkins was five minutes. I was not able to locate any case that suggests that five minutes is too long in duration, nor were the scope of the questions that were asked here outside of the scope that's reasonable. As Your Honors have pointed out, Officer Ray was within his right to ask the driver and the passenger to exit the car. He was also within his right to ask a limited number of questions regarding the stop and that were related to the stop, and that's what occurred here. Was there any evidence in terms of Officer Ray indicating whether he was going to cite the driver for the tinted windows problem? There's no evidence in the record as to whether Officer Ray had a subjective intent to cite the driver for the tinted windows, and we know that a citation was not actually issued here for those particular offenses. So move to the last issue, which appellants were not able to address in their time. Your Honor questioned whether Mr. Noble could deal with the scope of the search here, whether he could object under plain error review. Under 12E of the Federal Rules of Criminal Procedure, Mr. Noble has waived any argument regarding the scope of that appeal. If this court were to find good cause for not raising the arguments, only then could the court review this particular issue under plain error. Respectfully, here there is not good cause. Mr. Noble and the appellants issued their briefing on the motion to suppress. Then a hearing was held, and even after that event, the court allowed Mr. Noble to submit additional briefings. He didn't raise the issue of the scope of the frisk of his person in that additional briefing, so good cause does not exist. Were the attorneys here, and they're the same as the attorney at trial? Your Honor, yes. Mr. Gore and Mr. Anderson represented the appellants below. I did not represent the United States below. Okay, now, they didn't raise the cause, but we could be back here in a year or so on a 2255. If the court is interested in a plain error review, we would respectfully submit that there is no error here. Why don't you do that? Okay. You can see from the record, you'll see page ID 280 is the only place in the record in which the actual frisk of Mr. Noble is discussed. In that portion of the record, Officer Ray describes the feel of the package. There's no evidence that he manipulated or slid the narcotics, which would be impermissible under Dickerson and the Plainfield Doctrine. Instead, what he told you in the record there is that immediately upon feeling the package that was in Mr. Noble's right hand, he knew that that was narcotics. There's been some discussion as to whether he knew which particular type of narcotic was in Mr. Noble's pocket, but respectfully, that doesn't make a difference here. Under Dickerson and the Plainfield Doctrine, as long as the identity as contraband is immediately apparent, it doesn't make any difference that Officer Ray was not able to identify the chemical composition of the drugs. Well, I mean, didn't he say he thought it was crack, more specifically? He did. He thought it was crack cocaine, and he was wrong about that. So I guess that's my question. I mean, it would be one thing if he stated that, you know, his belief at a higher level of generality, and it turns out, you know, he was within it. But does it matter that he was wrong? Your Honor, I don't think it makes any difference that he was wrong as to the chemical composition of the drug. The fact that it was immediately apparent that it was some type of narcotic from the way that narcotics are packaged and the way that the narcotics felt is all that's required for the Plainfield. Crack is usually rocks, and this was sand. So, I mean, it sounds, it's just kind of hard to understand where he's coming from on that. Your Honor, my understanding is that sometimes crack cocaine can be kept in smaller rocks that might have a feel like a small rock or sand, and that might be what Officer Ray was observing there. He didn't have five years of training on that? Not on that particular issue, Your Honor. He did have five years of training on many things, but not on specifically the feel of different narcotics in someone's pocket while performing a frisk. If Your Honors have no further questions, we request that the Court affirm the decision of the District Court and decline to consider for the first time the suppression argument that was waived below. Thank you. Was there time saved for rebuttal? No. We appreciate the arguments of all of the lawyers and understand that Mr. Gore was appointed pursuant to the Criminal Justice Act, and we thank you for your representation of your client. All three cases will be submitted with the clerk call the next day.